### ANCHOR SAVINGS BANK, FSB, Plaintiff,

v.

### UNITED STATES of America, Defendant.

### No. 95–39 C.

United States Court of Federal Claims.

April 30, 2002.

---

Peter F. Garvin, III, with whom were George T. Manning and Edwin L. Fountain, Washington, DC, for plaintiff.

Patrick T. Murphy, with whom were David M. Cohen, Jeanne E. Davidson and William L. Small, Washington, DC, for defendant.

## OPINION AND ORDER

TURNER, Judge.

This case is among those collectively referred to as the *Winstar* litigation. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar III* ), *aff'g Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995)(en banc) (*Winstar II* ). Anchor Savings Bank was one of a number of thrift institutions which acquired failing thrifts during the 1980's under the supervision of federal regulators.

### I

This civil action encompasses claims arising from seven separate transactions occurring in the 1980's in which Anchor acquired eight thrift institutions. Three of the acquisitions involved "assisted" transactions, and the remaining four were "unassisted."

This opinion addresses only two of those seven transactions, one assisted, in which Anchor acquired two thrift institutions, Peachtree Federal Savings and Loan Association (Peachtree) in Atlanta, Georgia, and First Federal Savings and Loan Association of Crisp County (Crisp) in Cordele, Georgia, and the other an unassisted transaction in which plaintiff acquired by merger a single thrift, Standard Federal Savings and Loan Association (Standard) of Atlanta, Georgia.

There are pending seven individual motions by plaintiff filed on January 6, 1997 for partial summary judgment (one for each of the seven transactions giving rise to Anchor's claims), and four cross-motions by defendant filed on March 7, 1997 for summary judgment (which also, in the aggregate, deal with

each of the seven transactions). (The dispositive motions and cross-motions were the subject of extensive briefing and supplementation, including a supplemental memorandum filed by defendant on September 14, 1999, in which it moved to dismiss plaintiff's various claims of liability unrelated to the breach of contract claims.) Oral argument concerning the motions and cross-motions for summary judgment on liability related solely to the Peachtree/Crisp and Standard transactions was conducted on March 13, 2001.

We conclude that defendant is liable to plaintiff for breach of contract with respect to the Peachtree/Crisp merger (see Parts II, III and VI below) but that defendant is entitled to judgment with respect to the Standard merger (see Parts IV, V and VI below).

## II

On June 25, 1982, Donald Thomas, Chairman and CEO of Anchor, sent to the Federal Home Loan Bank Board (FHLBB) a letter describing Anchor's initial proposal to acquire by merger Crisp and Peachtree (as well as three other thrifts which were later deleted from Anchor's proposal). Pl.Ex. 201. The letter expressly noted that Anchor "utiliz[ed] purchase accounting" in structuring its merger proposal. *Id.* at 1. The original proposal letter also indicated that Anchor desired assistance in the form of Income Capital Certificates from the Federal Savings and Loan Insurance Corporation (FSLIC). *Id.* at 2. Later, Anchor dropped this assistance request from the proposal. Among other details of Anchor's bid, the bank asserted that "[a] key assumption reflected in this proposal is that the amount of goodwill resulting from this acquisition would be amortized to earnings over a 40–year period." *Id.* at 3.

Anchor's proposal evolved over the next several months. On August 26, 1982, Thomas sent to the FHLBB a revised proposal for acquiring the five thrifts. Pl.Ex. 83. Thomas highlighted a number of key elements to Anchor's offer. Among them he declared: "In connection with the purchase accounting to be used in the transaction, deferred losses applicable to . . . [Peachtree, Crisp, and the

other institutions] would be written off and included in goodwill. It should be noted that the assumption reflected in this proposal is that the goodwill resulting from this acquisition would be amortized to earnings over a 40–year period." *Id.* at 2.

By October 8, 1982, Anchor had again restructured part of its bid. Now Anchor proposed acquiring only Peachtree and Crisp, "utilizing purchase accounting and a payment of cash to Anchor of $5,000,000." Pl.Ex. 85. Anchor additionally asked that "FSLIC would provide . . . the usual protection against lawsuits, unknown tax claims, unfunded pension liabilities and severance pay claims." *Id.* On November 30, 1982, Eugene Schulz, Jr., vice chairman and general counsel for Anchor, sent to Bernard McKee, the "Regional Director" for FSLIC, a letter memorializing their telephone conversation regarding the Peachtree/Crisp proposal. Pl. Ex. 86. Schulz wrote: "We agree to reduce our request for assistance . . . from $5 million to $4 million, *with the other terms of our proposal remaining in place.*" *Id.* (emphasis added).

On December 3, 1982, Schulz again wrote to McKee and further amended the terms of Anchor's bid. According to the new letter, Anchor "agree[d] to acquire these institutions pursuant to merger agreements to be structured through FSLIC without direct financial assistance." Pl.Ex. 87. On the previous day, Schulz had received from Anchor's independent accountants, Peat, Marwick, Mitchell & Co. (Peat Marwick), a letter regarding the proposed mergers. Pl.Ex. 88.

The Peat Marwick letter noted that Peachtree and Crisp were "being required to merge by the FSLIC," that they would be "involuntarily combining their resources with Anchor," and that it was assumed that Anchor would be "receiving some form of financial assistance from FSLIC if this merger is consummated." *Id.* Peat Marwick concluded that "[b]ased on these facts, the purchase method of accounting should be used in accounting for the merger of these two associations with Anchor." *Id.* On December 9, 1982, Schulz notified the FHLBB by letter regarding the Peat Marwick evaluation. Pl. Ex. 89. Schulz specifically pointed out that

the accountants had endorsed the use of purchase accounting, and he expressly requested that the FHLBB's approval of the mergers include permission to implement purchase accounting. *Id.* at 1.

On December 10, the FHLBB documented in an internal memorandum the results of an agency "viability analysis" regarding Anchor's acquisition of Peachtree and Crisp. Pl.Ex. 92. The FHLBB included a specific note within a section entitled "Relevant Assumptions" that the determination was based upon "[g]oodwill [being] amortized over 40 years." *Id.* at 1. On December 13, the FHLBB drafted an interoffice memorandum analyzing the proposed assisted merger of Peachtree and Crisp into Anchor. Pl.Ex. 93. That FHLBB memorandum discussed "Accounting Issues," and noted that the agency had "been informed that the purchase method will be used." *Id.* at 5. Furthermore, the memorandum recommended a "standard condition for supervisory mergers" be included in the pending FHLBB resolution in the following form, *id.*:

> That Anchor shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent of the Federal Home Loan Bank of New York and to the Office of Examinations and Supervision, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on Anchor's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

On December 14, 1982, H. Brent Beesley, then the Director of the FSLIC, sent a letter to the FHLBB regarding the "FSLIC Assisted Merger of [Peachtree and Crisp] into [Anchor]." Pl.Ex. 203. Beesley recommended in the letter that the FHLBB "accept the proposal" of Anchor. *Id.* at 1. The memorandum detailed, *inter alia*, the terms of the Assistance Agreement, efforts made to resolve Peachtree and Crisp's respective financial troubles, and a "financial analysis of the alternatives that were considered in trying to resolve the problems at Peachtree and [Crisp]." *Id.* The memorandum also illustrated the extent to which Anchor's offer had evolved. The FSLIC pointed out that the "estimated present value cost to the FSLIC of the Anchor acquisitions is zero, since the only financial assistance being provided to Anchor is indemnification against undisclosed liabilities of Peachtree and [Crisp]. The term of the agreement will be three years." *Id.*

The FSLIC outlined that a series of attempts to find an appropriate firm to acquire Peachtree and Crisp at an acceptable cost had failed. Regulators first shopped within Georgia, and then interstate, for an appropriate thrift offering acceptable terms. *Id.* at 2. Several attractive out-of-state proposals were received, including Anchor's, and the regulators advised two Georgia-based bidders of their opportunity to match the "marginally assisted proposals." *Id.* The two in-state thrifts declined to submit new bids. *Id.* Among the three interstate bidders which FSLIC considered, only Anchor's bid had zero "net cash outlay" and zero "present value cost." *Id.* at 4. Hence, Anchor offered the "least costly bid to the FSLIC on Peachtree and [Crisp] ...." *Id.* at 5. Importantly, the FSLIC specifically found "further support of Anchor's proposed acquisitions [in] a viability analysis ... which indicates that the resulting association will remain viable into perpetuity." *Id.* This viability analysis had expressly assumed a 40-year amortization period. Pl.Ex. 92.

On December 16, 1982, the FHLBB adopted Resolution 82–824, officially approving the merger of Crisp and Peachtree into Anchor. Pl.Ex. 34. Among other things, the document conditioned the mergers "upon the execution of an Assistance Agreement between Anchor and the FSLIC ...." *Id.* at 1. The resolution noted that the FHLBB had already reviewed a "proposed form" of the assistance agreement, prior to the adoption of the resolution. *Id.* Resolution 82–824 stated that "approval of the mergers of Peachtree and Crisp County into and with Anchor are necessary to prevent the probable failures of Peachtree and of Crisp County; and

... [the merger was] instituted for supervisory reasons." *Id.* at 2.

The resolution further stated that "financial assistance by the FSLIC is necessary to prevent the defaults of Peachtree and of Crisp County." *Id.* at 3. The document also authorized the FSLIC to execute on its behalf "an agreement ... substantially in the form of the proposed Assistance Agreement, *provided* that the final form of such Agreement has been approved by the Office of the General Counsel." *Id.* Resolution 82–824 listed "Emergency Thrift Acquisition Findings," which noted that "the mergers of Peachtree and Crisp County into and with Anchor would lessen the risk to the FSLIC," and the "proposal for the mergers ... into and with Anchor, which was in a form and with conditions acceptable to the FSLIC, presented and presents the lowest expense to the FSLIC of any offer submitted." *Id.* at 4–5.

The FHLBB also addressed the use of purchase accounting. The agency declared "that the mergers shall be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles." *Id.* Moreover, "certification by Anchor's independent accountants that Anchor has accounted for the mergers in accordance with GAAP shall be considered satisfactory evidence that said purchase method of accounting is in accordance with GAAP." *Id.* at 6. Resolution 82–824 covered the issue of any forbearance associated with the merger. The FHLBB authorized and directed that "upon the mergers ... becoming effective ... to issue to Anchor a letter concerning supervisory forbearance ...." *Id.* Also on December 16, and following the adoption of 82–824, the FHLBB sent to Thomas a letter approving consummation of the mergers of Peachtree and Crisp into Anchor on the following day. Pl.Ex. 90.

On December 17, 1982, the FSLIC signed the supervisory assistance agreement (SAA) between Anchor and the FSLIC. *See* Pl.Ex. 38. The SAA recited that in "consideration of the mutual promises herein contained the parties enter into the following agreement." *Id.* at 2. A number of the SAA's provisions bear directly upon the issues in this case.

Section 4 of the SAA detailed the parties' indemnification agreement. Specifically, the section stated that in exchange for the new post-merger thrift "observ[ing] the covenants set forth in § 7," the FSLIC would indemnify Anchor for money the thrift paid "in satisfaction, settlement, or compromise of" certain liabilities of Crisp or Peachtree. *Id.* at 5–6. FSLIC would also indemnify "any claim, demand, cause of action, or judgment against either" of the thrifts, which might be filed "no later than three years after" the merger. *Id.* This indemnity provision is essentially what qualified the Peachtree/Crisp transaction as an "assisted" merger.

Section 7 of the SAA expressly described certain covenants imposed upon the new thrift in consideration of the indemnity protection. *See id.* at 9–10. By adhering to the covenants regarding Anchor's obligations with respect to any claims or alleged liabilities, the thrift could insure that no payment which it deserved would be withheld by the government.

Section 8 of the SAA addressed the accounting principles governing the agreement. *See id.* at 11. The SAA declared that

any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan and federal savings bank industry, except that where such principles conflict with the terms of this Agreement or with the applicable federal regulations, the Agreement or said regulations shall govern.... [T]he accounting principles and governing regulations shall be those in effect on the Effective Dates or as subsequently clarified or interpreted by the [FHLBB]. In case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with said regulations.

*Id.* Section 14 of the SAA integrated other contemporaneous documents into the agreement and stated:

This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supersedes all prior agree-

ments and understandings of the parties in connection with it, excepting only the Merger Agreements and any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the CORPORATION, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and either of the Merger Agreements, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the CORPORATION are concerned.

*Id.* at 13–14. Finally, the SAA concluded:

Although the RESULTING BANK is expected to incur certain business risks with respect to the assets and liabilities that it has assumed, it is intended that the purposes of this Agreement be accomplished without imposing an unreasonable financial burden on the RESULTING BANK. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein.

*Id.* at 15.

On December 20, 1982, the FHLBB issued a "forbearance letter" to Thomas which confirmed a number of the Peachtree/Crisp merger details. Pl.Ex. 44. First, the FHLBB confirmed that the acquisition was "supervisory." *Id.* at 1. Second, the FHLBB declared that since the mergers were initiated for supervisory reasons, "the Bank Board will forbear, for a period of five years following the Effective Dates, from exercising its authority under Section 563.13(c) of the Insurance Regulations because of Anchor's failure to comply with the statutory reserve and net worth requirements of Section 563.13 ...." *Id.* at 1–2. The five-year net worth forbearance was limited strictly to any failure resulting from circumstances directly attributable to the acquisition of Peachtree and Crisp. *Id.* at 2. Third, the FHLBB promised to "waive or forbear, for a period of five years following the [merger], with respect to any net worth requirement in any regulation" which the FHLBB issued. *Id.* This promise came with the caveat that any such regulation granted the FHLBB the discretion to waive a net worth requirement. *Id.*

Most importantly, the forbearance letter stated:

Provided that Anchor submits analyses, accompanied by a concurring opinion from its independent accountants, satisfactory to the [FHLBB or its agents] ... that (a) describe specifically ... any intangible assets (including goodwill) ... arising from the Mergers to be recorded on Anchor's books, (b) substantiate the reasonableness of amounts attributed to intangible assets ... and related amortization methods and periods, and (c) conclude that Anchor has accounted for the Mergers in accordance with generally accepted accounting principles ("GAAP"), as GAAP existed as of the [merger], Anchor's use of the purchase method of accounting shall be considered to be in accordance with GAAP and with regulatory accounting procedures.

*Id.* at 2–3. Anchor's FHLBB forbearance letter stipulated that it did not serve as "forbearance or waiver ... with respect to any regulatory requirement *other than those encompassed within the preceding paragraphs.*" *Id.* at 3 (emphasis added).

### III

▆ The principal case law controlling disposition of the issues under discussion is that in the Supreme Court's plurality opinion in *Winstar III,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), as well as the Federal Circuit's majority *en banc* decision in the same case, *Winstar II,* 64 F.3d 1531 (Fed. Cir.1995). The factual background in the *Winstar* litigation concerned three separate and distinct mergers of thrift institutions. In each of those mergers, the Federal Circuit, affirming the Court of Federal Claims, found contracts between the thrifts and the government which had been breached by enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). *Winstar II,* 64 F.3d at 1534, 1551.

Resolution of the dispositive motions addressing the Peachtree/Crisp transaction turns primarily on the straightforward question of whether there was a contract between

Anchor Savings Bank and the United States permitting long-term amortization of supervisory goodwill generated in the constituent mergers. *See, e.g.,* Tr. (3/13/01) at 39–40. One of the transactions analyzed within the original *Winstar* litigation was a merger executed by Glendale Savings Bank. We find the Federal Circuit's analysis in *Winstar II* of the circumstances surrounding the Glendale transaction directly relevant to the facts detailed above regarding Anchor's acquisition of Peachtree and Crisp. *Winstar II's* analysis of the Glendale merger provides the guideposts for resolving whether Anchor received a contractual promise regarding the future treatment of the goodwill obtained during its merger with Peachtree and Crisp. *See Winstar II,* 64 F.3d at 1540 (finding that "the government had an express contractual obligation" to Glendale).

Glendale Federal Bank was a profitable, regulatory-compliant institution which had been sought out by First Federal Savings and Loan Association of Broward County (Broward). *Id.* at 1536. Broward, a struggling savings and loan, had suggested the merger of the two thrift institutions. *Id.* The two banks independently negotiated a merger agreement which was expressly conditioned upon both the FSLIC's approval of the merger and the agency's granting permission to utilize purchase method accounting. *Statesman Sav. Holding Corp. v. United States,* 26 Cl.Ct. 904, 909 (1992).

The documents comprising the Glendale transaction included an SAA between Glendale and the FSLIC. Within that SAA, the FSLIC approved the merger agreement negotiated between Glendale and Broward. *Id.* The SAA described how Broward had reached a " 'financial condition . . . such that remedial action must be taken.' . . . 'Broward is in danger of default and that the nature and/or amount of' . . . [government] 'assistance would be less than the losses FSLIC would sustain upon' " Broward's liquidation. *Id.* (quoting the SAA). This court also found that the SAA included an integration clause detailing "the documents that would control the interpretation of the parties' agreement." *Id.* The clause stated:

> This Agreement, together with an interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement . . . and supersedes all prior agreements and understandings . . . excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith by the FHLBB or the FSLIC, *provided,* however, that in the event of any conflict, variance or inconsistency between this Agreement and the Agreement of Merger, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the FSLIC are concerned.

*Id.* at 909–10 (internal quotation omitted) (quoting SAA).

The FHLBB contemporaneously issued a forbearance letter, *id.* at 910, in which it promised "to forbear from exercising its authority to bring enforcement proceedings against Glendale for failing to satisfy regulatory capital requirements following the merger." *Id.* (internal quotation omitted). However, the forbearance letter did not "specifically address the use of the purchase method of accounting for the merger." *Id.*

Both this court and the Federal Circuit found that the FHLBB Resolution which approved the merger (FHLBB Resolution 81–710) constituted an essential component of the agreement. *Id.* Resolution 81–710 required Glendale to submit "an opinion letter satisfactory to the Board's supervisory agent from its independent accountants justifying the use of the purchase method of accounting, specifically describing any goodwill arising from the merger, and substantiating the reasonableness of the amounts attributable to goodwill and the resulting amortization periods and methods." *Winstar II,* 64 F.3d at 1536–37.

As the *Winstar* case and its progeny have extensively detailed, Congress attempted to resolve the continuing savings and loan crisis by enacting FIRREA. *Id.* at 1538. The legislation effected numerous and substantial changes to the regulation of the nation's thrift industry, but the change most pertinent here may be found in a provision which explicitly prevented "the continued use of

supervisory goodwill to satisfy regulatory capital requirements." *Id.* Three new capital standards were implemented, and the significance of goodwill was marginalized under all of them. *Id.* Supervisory goodwill was excluded from "minimum tangible capital," was ordered completely phased out from use in "core capital" by the end of 1994, and was limited to an amortization period of 20 years if applied to "risk-based capital." *Id.*

The Federal Circuit found that the government had expressly obligated itself, by contract, "to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes." *Id.* at 1540. Furthermore, Glendale was held contractually entitled to amortize most of that goodwill over 40 years. *Id.* The government insisted that the only evidence of a contract might be obtained from the SAA, which contained no promise regarding goodwill and its amortization. *Id.* But the Federal Circuit determined that this Court had correctly "included the contemporaneous resolutions and letters issued by the FSLIC and the Bank Board," as part of the contract. *Id.* The appellate court concluded that this was the appropriate result because of the SAA's integration clause. *Id. See also Winstar III,* 518 U.S. at 863–64, 116 S.Ct. 2432 ("we have no doubt that the parties intended to settle regulatory treatment of these transactions as a condition of their agreement. . . . We accordingly have no reason to question the Court of Appeals' conclusion that the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes." (internal quotation omitted)).

Among the contemporaneous documents which the Federal Circuit found directly relevant was FHLBB resolution 81–710, which approved the merger, conditioned upon Glendale satisfying certain requirements. *Winstar II,* 64 F.3d at 1540. Thus, the Federal Circuit held that through the resolution

> the Bank Board clearly evidenced its approval of the terms of the merger, including the terms that the purchase method of accounting would be employed in account-

ing for the merger, that goodwill arising from the merger would be recorded on Glendale's books, and that such goodwill would be amortized for reasonable periods under reasonable methods, provided these accounting treatments were justified to the satisfaction of the Bank Board's supervisory agent.

*Id.* at 1541. The court concluded that "based on all of the contemporaneous documents," which validly constituted part of the agreement, the FHLBB and FSLIC "were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountants' letter." *Id.* at 1541–42. The court further noted that Glendale, by acquiring the failing thrift, had "saved the government hundreds of millions of dollars" *Id.* at 1542.

After reaching its holding on the existence of a contract and the subsequent breach, the Federal Circuit referred to "other evidence" and "circumstances surrounding the transaction" which supported the court's decision. *Id.* The court stated that as a matter of simple logic, if Glendale and the FSLIC lacked the intent "to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use." *Id.* During oral argument in this case, defendant insisted that the Peachtree/Crisp transaction lacked any sort of extensive negotiations and that the absence of such negotiations clearly meant that no contract had been formed between Anchor and the government. Tr. (3/13/01) at 45–47. We disagree.

The Federal Circuit's conclusion regarding the existence of a contract relied upon various contemporaneous documents implementing the Glendale merger. Our conclusion here regarding the existence of a contract relies upon a series of interrelated documents which substantially match those found in the Federal Circuit's *Winstar II* analysis of the Glendale transaction.

The government claimed that the Glendale Resolution 81–710 simply represented then-current prosecutorial and regulatory policy. *Winstar II,* 64 F.3d at 1542. But the Federal Circuit rejected the argument, stating that

"[o]nce specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract, both parties were bound to them." *Id.* The court explained that this conclusion had no impact on the government's ability to change statements of policy; however, since this was a contract, the terms "could not be changed except by mutual consent." *Id.*

The government also contended that the SAA had expired by its own terms prior to FIRREA's enactment. *Id.* The Federal Circuit answered that the expiration provision applied only to "executory provisions ... in the SAA, which obligated FSLIC to make certain payments ...." *Id.* Therefore, the expiration provision failed to eliminate "other obligations under the merger plan, including the specific time periods for amortization of goodwill." *Id.*

The circumstances of the Glendale merger, at least in terms of the various associated documents and their content, are nearly identical to those associated with Anchor's merger with Peachtree and Crisp. Both Glendale and Anchor received SAA's from the government. Both Glendale and Anchor received forbearance letters from the FSLIC. FHLBB Resolution letters authorized the mergers in both the Glendale and Anchor transactions.

Furthermore, the relevant documents of both mergers failed to specifically mention amortization time periods, but rather looked to independent accountant opinions for guidance whether purchase accounting was appropriate, and whether amortization periods were reasonable. The Federal Circuit declared that the approval of purchase accounting and the determination of reasonable periods of amortization (based on FHLBB Memorandum R31b; *see* Pl.Ex. 8) were subsequently integrated into the contract and became definite, unalterable terms of the contract. Provided the striking similarities between Glendale and Anchor, that conclusion should likewise apply to Anchor's merger with Peachtree and Crisp.

Defendant claims that the Peachtree/Crisp forbearance letter expired by its own terms prior to FIRREA's enactment, and further,

that the forbearance was merely regarding the application of regulatory net worth requirements to Anchor's acquisition of Peachtree and Crisp. *See* Tr. (3/13/01) at 54–55. However, the Federal Circuit has refuted this argument. *See California Fed. Bank v. United States,* 245 F.3d 1342 (Fed.Cir.2001) (*CalFed II*).

In *CalFed II,* the court directly addressed the government's claim that "even if there were contracts in the ... transactions, their term was limited to five years by the net worth forbearances." *Id.* at 1348. The government asserted that "[b]ecause these five-year agreements expired prior to the passage of FIRREA, ... FIRREA and its regulations did not breach any contracts with Cal Fed." *Id.* We find the Federal Circuit's treatment of this argument dispositive of defendant's similar argument here against Anchor.

Looking to the Supreme Court's *Winstar* opinion, the Federal Circuit observed that "the Supreme Court allowed amortization of goodwill over the entire period authorized by the forbearances and not merely for the five-year term of the net worth forbearances." *Id.* (citing *Winstar III,* 518 U.S. at 864–66, 116 S.Ct. 2432). FIRREA and its regulations had indeed breached contracts regarding the treatment of supervisory goodwill. *Id.* The expiration of the five-year period related "only to the net worth forbearances that barred the FHLBB from enforcing its capital requirements for five years to the extent that any violation of those requirements was traceable to the subject acquisitions." *Id.* Other sections of the forbearance letters permitting long-term amortization of goodwill "were separate and apart from the five-year enforcement-related terms." *Id.*

The Federal Circuit's conclusion that other sections of the forbearance letters retained independent significance refutes defendant's argument in Anchor about the irrelevance of the forbearance letter. Paragraph five of the Peachtree/Crisp forbearance letter addressed the long-term treatment of intangible assets, permitting purchase method accounting provided an independent analysis confirmed the "reasonableness" of the amounts and of the "related amortization methods and periods."

Pl.Ex. 44 at 3. The Peachtree/Crisp forbearance letter used language clearly indicating the independent significance of each portion of that letter ("This letter does not ... constitute forbearance or waiver by the Bank Board with respect to any regulatory requirement *other than those encompassed within the preceding paragraphs 1 through 5.*") *Id.* (emphasis added).

As our analysis of *Winstar's* Glendale transaction demonstrated, the fact that the forbearance letter did not list a specific time period for amortization did not disprove a contract. Nor does it do so here. And, notwithstanding the forbearance letter, "the five-year expiration provision of the net worth forbearances does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill." *CalFed II*, 245 F.3d at 1348 (citing *Winstar II*, 64 F.3d at 1542).

Defendant urges that several cases from other courts or in other settings provide clear guidance against finding contractual liability. Defendant primarily points to *Flagship Fed. Sav. Bank v. Wall*, 748 F.Supp. 742 (S.D.Cal.1990), *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203 (4th Cir.1992), and *Cienega Gardens v. United States*, 162 F.3d 1123 (Fed.Cir.1998). Defendant maintains that these cases stand for the proposition that in the absence of explicit contractual arrangements, with specific promises by the regulators, a contract simply cannot be found. Defendant additionally claims that when the government carries out a regulatory act, and a private party relies on that act, there is simply no contract binding upon the government.

In many situations, aside from *Winstar* and its progeny, we certainly would not disagree with defendant's arguments. Indeed, were it not for the *Winstar* jurisprudence from the Federal Circuit and the Supreme Court, Anchor would have difficulty showing that the Peachtree/Crisp transaction included a contractual promise that Anchor would be immune from general regulatory change regarding treatment of goodwill. The federal government operates numerous regulatory agencies which constantly promulgate regulations and provide administrative oversight upon which private parties rely, yet those regulations undergo a constant process of review, evolution, and adjustment.

The banking and financial industries represent the paradigm of intense government regulation. *See Winstar III*, 518 U.S. at 863, 116 S.Ct. 2432 (referring to "the regulators' proven propensity to make changes in the relevant requirements"). Consequently, private businesses engaged in this field stay prepared for constant fluctuation of regulatory requirements which may impact their business dealings. We must adhere to the Federal Circuit's and Supreme Court's rationale in *Winstar*, despite the legal principle that discourages finding contracts in the basic regulatory context. Specifically relevant here, the circumstances surrounding the Glendale merger provide a framework so closely resembling Anchor's Peachtree/Crisp transaction that we believe that Anchor's position must prevail. Thus, we find the cases offered by defendant unpersuasive in changing our conclusion regarding the existence of a contract between Anchor and defendant for immunity from regulatory change concerning amortization of goodwill.

In *Flagship Federal*, a federally chartered savings bank claimed, *inter alia*, that a forbearance letter provided to it by the FHLBB regarding certain regulatory capital requirements created a binding agreement with the government. *See Flagship*, 748 F.Supp. at 748. The plaintiffs sought a temporary injunction, but the district court held that the plaintiffs failed to demonstrate a likelihood of success on the merits. *Id.* at 747. The court determined that the forbearance was merely a statement of position, not a contract, and that to the extent the forbearance letter might appear to be a contract, it was illusory, because the FHLBB had expressly reserved the right to cancel the forbearance at the agency's discretion. *Id.* at 748.

We find *Flagship Federal* distinguishable from the Peachtree/Crisp transaction in that Anchor's forbearance letter did not include a government reservation to cancel the forbearance at its discretion, and the Peachtree/Crisp transaction involved documentation in addition to a forbearance letter and related FHLBB resolutions. Further, it is

questionable whether the district court's apparent conclusion that FHLBB resolutions and a forbearance letter could not be construed as parts of a contract, *id.*, would be the same after *Winstar III,* 518 U.S. at 860–71, 116 S.Ct. 2432.

In *Charter,* the Fourth Circuit considered whether a federal savings bank received a contractual promise from the FHLBB to "treat supervisory goodwill as an asset for statutory capital reporting requirements in return for Charter's acquisition of certain failing thrifts." *See* 976 F.2d at 204. As in *Flagship,* the thrift sought declaratory and injunctive relief based on the assertion that the FHLBB was obligated by a contract, without regard to the new requirements of FIRREA, to permit approved long-term amortization of supervisory goodwill, and that breach of such contract, e.g., by implementing FIRREA, would entitle the bank to rescind its supervisory merger with several troubled thrifts. *Id.* at 207.

The Fourth Circuit found that no contract existed between the plaintiff bank and FHLBB, *id.* at 210–13, despite the facts that agents of FHLBB repeatedly sought the agreement of the bank to acquire failing thrifts and offered to permit the acquiring bank to treat the negative net worth of the acquired thrift as supervisory goodwill which could then be amortized over a period of many years, that plaintiff bank acquired thrifts at the FHLBB's urging and that FHLBB approved the merger and the bank's amortization of supervisory goodwill, and that after the initial merger transaction, two other merger transactions with failed thrifts were consummated at FHLBB's behest upon the same terms as governed the initial transaction. *Id.* The Fourth Circuit's opinion was based on a determination that no express contractual language was used, nor did the transaction include certain documents that other courts had found significant. *Id.* at 211 & n. 12. The court explained that in such a highly regulated industry, the FHLBB would not have promised to refrain from enforcing future regulatory capital requirements unless it had explicitly so stated. *Id.* at 211.

*Charter* clearly supports defendant's position concerning the Peachtree/Crisp transaction, but we believe that the decision cannot withstand analysis in light of *Winstar III,* 518 U.S. at 860–71, 116 S.Ct. 2432, and in this court, controlled as it is by Federal Circuit precedent, *Charter* could not withstand application of *Winstar II,* 64 F.3d at 1539–42, and *CalFed II,* 245 Fed.3d at 1346–48. Further, unlike the *Charter* transactions, the Peachtree/Crisp transaction did include an SAA.

The Federal Circuit has clearly decided that even within the heavily regulated banking context, several documents may be read together to find an express contract regarding the future treatment of goodwill and regulatory capital. *Winstar II,* 64 F.3d at 1539–42. Furthermore, the Federal Circuit found exactly such a contract in the Glendale case, despite the absence, in all of the relevant documents, of any explicit promise regarding the exact length of time that thrift would be permitted to amortize goodwill. *Id.*

In *Cienega Gardens,* another case in which claimants in a regulated environment unsuccessfully asserted the existence of binding agreements with the federal government, the Federal Circuit reviewed government changes to a low-income housing program supervised by the Department of Housing and Urban Development. 162 F.3d at 1123.

Congress created the particular program to provide an incentive for private developers to become involved with constructing, owning and managing low-income housing. *Id.* at 1125. The incentive consisted of government guarantees of low-interest mortgage loans to project developers. *Id.* The favorable interest rates obligated the developers to restrict income levels of tenants and to observe ceilings on rental rates. *Id.* Documents accompanying the mortgage transactions permitted the developers to prepay the low-cost loans in full after twenty years (and thus be free of constraints upon tenants' income and rental rates). *Id.* at 1126.

In the late 1980's, as the twenty-year point approached, Congress grew concerned that many developers would prepay their loans, causing a shortage in low-income housing. *Id.* To prevent this, Congress, in 1988, placed a two-year moratorium on prepayment un-

less HUD approved. *Id.* In 1990 Congress made the moratorium permanent. *Id.* The developers sued the government, claiming that enactment of the moratorium breached a contract. *Id.* at 1127. The Court of Federal Claims found liability for breach of contract. *Cienega Gardens v. United States,* 33 Fed.Cl. 196 (1995).

The Federal Circuit reversed, deciding that a "transaction framed by the [HUD] commitment [to guarantee repayment of the loan], the deed of trust note, the deed of trust, the loan agreement, and the regulatory agreement [between a developer and HUD], each of which was in a form approved by HUD," did not constitute privity of contract between HUD and the developers regarding the developers' entitlement to prepay the loans. *Cienega Gardens,* 162 F.3d at 1131. The Federal Circuit held that the deed of trust note and the regulatory agreement each stood alone and represented "separate agreements between distinct parties." *Id.* at 1133. The appellate court found that the regulatory agreement did not expressly address prepayment, and the other transaction documents failed to demonstrate privity of contract between the developers and HUD regarding a right to prepay the loans. *Id.* Furthermore, the HUD regulations concerning prepayment expressly noted that they were subject to amendment. *Id.*

It is difficult to reconcile the rationale of *Cienega,* a 1998 case, with that of *Winstar II,* the Federal Circuit's 1995 *en banc* decision finding binding agreements discerned from various documents and approvals by regulatory agencies in an arguably analogous context. Thus, *Cienega,* the later case, might at first glance appear to support defendant's position, but the Federal Circuit expressly distinguished *Cienega* from the *Winstar* context. *Id.* at 1135–36. The Federal Circuit noted that in *Winstar,* the plaintiffs had "integration clauses that expressly incorporated contemporaneous documents that allowed them to use supervisory goodwill" and extended amortization periods. *Id.* at 1136. In *Cienega,* the appellate court found that "no documents between HUD and the [developers] address prepayment," that none of the relevant documents incorporated one another

by reference, and that therefore *Winstar* offered no support to the plaintiffs. *Id.*

Thus, despite the potentially compelling arguments defendant makes from the facts and analysis of the *Cienega* opinion, the Federal Circuit's facial distinction of the *Winstar* context and the fact that *Winstar III, Winstar II* and *CalFed II* are clearly controlling in cases arising from the enactment of FIRREA lead us to reject defendant's application of *Cienega* to the Peachtree/Crisp transaction.

**IV**

Standard Federal Savings and Loan Association (Standard) was a thrift institution located in Atlanta, Georgia. Pl.Ex. 159 at 1. The FHLBB's Office of Examinations and Supervision, on April 9, 1982, identified Standard as a thrift institution whose "operating losses have escalated sharply," and whose "net worth remaining as of March 31, 1982, will be exhausted within five months." Pl. Ex. 218 at 2–3. The "impending insolvency" had resulted from the "high cost of money," as well as "declining liquidity levels," and "an excessive investment in fixed assets." *Id.* at 3. By June 30, 1982, the FHLBB concluded that "merger appears inevitable," and that an "out-of-state merger appears probable," because in-state bidders sought excessive FSLIC assistance. Pl.Ex. 220 at 1.

According to plaintiff, Sam Connell, the FHLBB Supervisory Agent in Georgia, "initiated the transaction" between Anchor and Standard. Tr. (3/13/01) at 74–75. Plaintiff points out that James Varner, then-president of Standard, had been in discussions with Connell regarding the need to find a suitable buyer of Standard. *Id.* Connell arranged a meeting between Thomas and Varner, where the parties might discuss the possibility of Standard's merger with Anchor. *Id.* As the Peachtree/Crisp transaction demonstrates, at the time that Anchor became interested in Standard, Anchor had already been recognized by bank regulators as a prospective institution suitable for acquiring failing thrifts.

On December 21, 1982, Thomas wrote to Varner to "confirm and supplement" an earlier meeting concerning possible merger. Def.

Supp. Br. (9/14/99), App. at 264. Thomas stated: "We are anxious to add to Anchor's Georgia base and believe that a voluntary merger between Standard and Anchor would well serve the people and institutions involved." *Id.* On December 22, 1982, Thomas also wrote to the FHLBB Supervisory Agent in New York to inform him, *inter alia,* that Anchor was "now attempting to work on a voluntary merger with Standard and [I] have made a strong proposal to them." Pl.Ex. 105.

On January 24, 1983, Thomas and Varner entered into a merger agreement on behalf of their respective institutions. Pl.Ex. 51. Included among the terms of the agreement was a section describing "Conditions Precedent to Merger." *Id.* at 9. The merger agreement required "unconditional approval" by the FHLBB and an opinion from independent auditors regarding "the use of purchase accounting with respect to the assets and liabilities of the Merging Association in accordance with Bank Board Resolution 82–785." *Id.*

On March 15, 1983, the FHLBB Supervisory Agent in New York recommended that the "supervisory" merger of Standard into Anchor be approved. Pl.Ex. 159 at 1. In the memorandum recommending approval, the agent noted that Anchor had proposed "to acquire [Standard], without FSLIC assistance, ... using the purchase method of accounting" and that Anchor had submitted an accountant's opinion which confirmed that the transaction was in accord with GAAP. *Id.* Further, the merger was considered "supervisory" because of "Standard's deficit reserves and undivided profits of over $2 million at December 31, 1982." *Id.* The memorandum additionally stated that "Supervisory forbearances have not been requested," that "No unusual conditions will be imposed," that "No FSLIC involvement is contemplated," and that the "Financial condition of the resulting institution will satisfy the Board's minimum financial standards." *Id.* at 2. (The memorandum further noted that plaintiff had completed "two FSLIC-assisted supervisory mergers in December 1982" involving Georgia thrifts. *Id.* The Standard merger then under consider-

ation was in obvious contrast to those prior mergers.)

The FHLBB issued a merger approval letter on March 16, 1983. Def. Supp. Br. (9/14/99), App. at 282; Pl.Ex. 55. On March 18, Thomas informed Varner of the Bank Board's approval and confirmed that the merger would become effective on March 21, 1983. Def. Supp. Br. (9/14/99), App. at 287. The merger was consummated "in accordance with the Merger Agreement of January 20, 1983." Id. at 288.

Nothing about the Standard transaction suggests that plaintiff was looking for a guarantee that a change in regulations generally applicable to thrifts would not apply to Anchor. Plaintiff acknowledged at oral argument that the merger "was an unassisted deal, in that it involved no assistance from the FSLIC to Anchor, either in the form of a cash contribution or indemnities or guarantees after the transaction was consummated. And it does not involve an assistance agreement." Tr. (3/13/01) at 72. Anchor's counsel stated:

> There is not the same sort of paperwork within the Bank Board with respect to unassisted deals, as there is with assisted deals. Obviously because the Government is not being asked to kick in money, or to make certain guarantees that would cause it to kick in money at a later date. So there is not the paperwork to the FSLIC that is involved.... [T]here is not a legal memo from the General Counsel's Office.

*Id.* at 77. Further, no forbearance of any kind, whether or not related to supervisory goodwill, was requested or granted.

## V

■ Concerning the merger of Standard into Anchor, plaintiff essentially argues that the merger agreement between Anchor and Standard, the merger application to the FHLBB, and the subsequent FHLBB approval letter, coupled with the fact that Connell introduced Thomas to Varner, are sufficient to evince a contractual promise by the government regarding long-term amortization of goodwill resulting from the merger. We cannot agree.

Plaintiff relies upon *California Fed. Bank v. United States,* 39 Fed.Cl. 753 (1997) (*CalFed I* ) to support Anchor's position that the Standard transaction included a contractual promise from the government. The motions addressed herein were briefed and argued prior to the Federal Circuit's affirmation of *CalFed I* in *California Fed. Bank v. United States,* 245 F.3d 1342 (Fed.Cir. 2001) (CalFed *II* ); plaintiff undoubtedly adopts the Federal Circuit authority as well. While *CalFed I* and *II* held that an assistance agreement with an integration clause is not essential to the existence of a contract in *Winstar*-type transactions, neither opinion provides persuasive support for plaintiff's assertion of contract formation in the Standard transaction.

*CalFed I* addressed transactions in four separate *Winstar*-type cases, whereas *CalFed II* deals only with transactions involving the lead plaintiff in *CalFed I.* Plaintiff claims that *CalFed I's* analysis of the *Landmark* and *Suess* thrift transactions shows that the documents and circumstances in those two instances match the documents and circumstances in Anchor's acquisition of Standard. Tr. (3/13/01) at 80–81. The trial court found contracts with the government in both cases. *CalFed I,* 39 Fed.Cl. at 774–75 (*Landmark* ) & 775–76 (*Suess* ). However, the *CalFed I* holdings concerning *Landmark* and *Suess* are easily distinguished.

In the *Landmark* circumstance, there were two acquisitions, one for Dixie Savings and Loan Association (Dixie) and one for St. Bernard Savings and Loan Association (St.Bernard). *Id.* at 758–59. In Dixie, there existed an Assistance Agreement among Landmark Land Company, Dixie, and the FSLIC. *Id.* at 759. In the assistance agreement, the FSLIC agreed to a $21 million cash contribution and expressly provided for the amortization of supervisory goodwill over 40 years. *Id.* With respect to St. Bernard, although an assistance agreement was absent, there were several regulatory forbearances ᐧ negotiated and granted through FHLBB resolutions. *Id.* at 774–75.

In the *Suess* circumstance, Benjamin Franklin Savings and Loan Association (Benjamin) acquired two failing thrifts, Western Heritage Savings and Loan and Equitable Savings and Loan. *Id.* at 759. The Western Heritage transaction included several accounting forbearances, one of which expressly permitted the amortization of goodwill over 40 years. *Id.* at 761. In addition, there was an Assistance Agreement (strongly suggesting mutual intent to contract) that specifically provided for the use of GAAP, and in which FSLIC provided to Benjamin a cash contribution to facilitate the merger. *Id.* at 763. Finally, the assistance agreement included an integration clause which incorporated contemporaneous resolutions and letters regarding the merger. *Id.* at 761–62.

As for Benjamin's acquisition of Equitable, *CalFed I* acknowledged that the transaction was "less explicitly documented than those in either *CalFed* (i.e., the individual case) or *Landmark.*" *Id.* at 776. This cryptic reference to the documentation in the Equitable matter makes comparison difficult, but the application for regulatory approval of the merger submitted by the merging institutions included a statement that the acquiring thrift's "obligations ... to complete the Acquisition are conditioned upon receipt of the regulatory forbearances regarding compliance with applicable net worth requirements and the other matters set forth in the form of supervisory forbearance letter." *Id.* at 769 (internal quotation omitted). In any event, there was sufficient evidence for the trial judge to find as a fact that there was mutual intent to enter a binding agreement assuring the acquiring thrift that it could count significant portions of supervisory goodwill as regulatory capital over the long term. We see no such facts in connection with Anchor's acquisition of Standard.

Concerning the transactions discussed in *CalFed I,* plaintiff's contention that *Landmark* and *Suess* are "identical" to Standard's circumstances is plainly incorrect. Three of the four transactions in *Landmark* and *Suess* clearly involved much more than plaintiff has described for Standard, i.e., merely a merger agreement between private parties (albeit parties introduced by an FHLBB official at a time when the thrift insurance fund was insolvent), a merger application to the FHLBB, and the FHLBB's approval letter.

We fail to discern the requisite offer, acceptance and consideration to constitute a contract from FHLBB's approval of such a "bare-bones" merger. As for the weight given to *CalFed I's* analysis of Equitable, we think the Federal Circuit's *Winstar* analysis a more appropriate guide as to what constitutes a contract in this context.

Recently, the Federal Circuit considered the question of whether there was a contract, specifically in the circumstances surrounding California Federal Bank's acquisitions. *See California Fed. Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*CalFed II*). *CalFed II* found a contract despite the absence of an assistance agreement. However, *CalFed II* fails to bolster plaintiff's position with regard to Standard.

In *CalFed II*, the Federal Circuit noted that its opinion in *Winstar II* "did not rely exclusively on the assistance agreements to find a contract; it considered contemporaneous documents and surrounding circumstances that included forbearance letters *like those present here.*" *Id.* at 1346 (emphasis added). Neither the lack of an assistance agreement nor "the form of consideration offered by the government" ruled out the existence of a contract. *Id.* at 1346–47. The Federal Circuit endorsed *CalFed I's* analysis for determining whether a transaction lacking an assistance agreement might still be found to include a contract regarding treatment of goodwill. *Id.* at 1347. The Federal Circuit agreed that "if the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and FHLBB resolutions confirm that intent, the absence of an assistance agreement [is] irrelevant to the finding that [such] a contract existed." *Id.* (quoting *CalFed I*, 39 Fed.Cl. at 773).

*CalFed II* repeatedly emphasized (1) the bargained-for aspect of the transactions in which a contract had been found and (2) the expression of the regulators' assurances in forbearance letters. *Id.* at 1346–47. Indeed, the critical facts for the Federal Circuit amounted to "the supervisory goodwill and the amortization periods *reflected in the forbearance letters.*" *Id.* at 1347 (emphasis added). The Federal Circuit found that the "documentary evidence" established "this long-term amortization of goodwill was a central consideration in CalFed's acquisitions. . . . [and] demonstrates that purchase accounting and amortization of goodwill were *essential terms* of the *negotiated* transactions." *Id.* at 1348 (emphasis added).

The factual circumstances and documentation of Anchor's unassisted acquisition of Standard were not similar to those giving rise to findings of contract in *CalFed II*. As mentioned, the Standard transaction included only a merger agreement between private parties, a required application for FHLBB approval of the merger, and the FHLBB's approval letter. As the Federal Circuit made clear in *CalFed II*, the absence of an assistance agreement is not the critical factor in determining the existence of contract, *vel non*. *Id.* at 1346–48. Rather, courts must determine whether there was "mutual intent to contract[,] including an offer and acceptance" and consideration. *Id.* at 1346. Not only did the Standard transaction lack an assistance agreement (which, though not essential, at least would memorialize bargained-for terms in traditional contract format), it also lacked any forbearance letter. We do not interpret the case law construing *Winstar*-type transactions as establishing a standard so broad as to require or permit construing the Standard transaction as one involving express or implied contractual assurances by the government for the long-term amortization of goodwill.

## VI

Having applied the rationale and analysis of *Winstar II* and *Winstar III*, we find that the facts and circumstances of the Peachtree/Crisp transaction lead to the finding of a contract between plaintiff and the government regarding the long-term accounting treatment of goodwill from the acquisition of those thrifts, as well as the subsequent breach of that contract by the enactment of FIRREA. On the other hand, we find nothing in the documentary facts and circumstances of the unassisted Standard transaction which would make the government's involvement in that merger anything

more than regulatory oversight in a heavily-regulated industry. Consequently, we find no contract between the government and plaintiff regarding the Standard merger.

## VII

Based on the foregoing, we conclude that a contract existed with regard to the Peachtree/Crisp transaction and that the contract was breached. However, we further conclude that no contractual relationship existed between Anchor and defendant with regard to the Standard merger.

Accordingly, (1) plaintiff's motion filed on January 6, 1997 for partial summary judgment relating to its December 17, 1982 acquisition, by assisted merger, of Peachtree Federal Savings and Loan Association and Federal Savings and Loan Association of Crisp County, Georgia is GRANTED, and (2) plaintiff's motion filed on January 6, 1997 for partial summary judgment relating to its March 21, 1983 acquisition, by unassisted merger, of Standard Federal Savings & Loan Association is DENIED. Correspondingly, defendant's cross-motions filed on March 7, 1997 for summary judgment, to the extent that they concern said acquisitions of Peachtree/Crisp and Standard, are DENIED with respect to the Peachtree/Crisp transaction and GRANTED with respect to the Standard acquisition.

Entry of judgment in favor of defendant concerning the Standard transaction shall be withheld pending resolution of remaining issues in the case.

The parties shall file by Friday, May 24, 2002 a joint status report which shall include recommendations for procedures to resolve the remaining dispositive motions (involving five separate merger transactions) and damages issues related to the Peachtree/Crisp contract. The status report shall also advise whether either party seeks partial judgment pursuant to RCFC 54(b) concerning the Standard transaction.

It is anticipated that a telephone conference among counsel and the court for further scheduling will be arranged upon the filing of said status report.