**WINSTAR CORPORATION & United Federal Savings Bank, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 90–8C.**

United States Claims Court.

July 27, 1990.

Charles J. Cooper, with whom were Robert R. Vieth and Michael Carvin, Washington, D.C., for plaintiffs.

John R. Tyler, with whom were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, and Theodore C. Hirt, Asst. Director, U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This dispute stems from the acquisition of a failing savings and loan prior to the enactment of the Financial Institutions Re-

form, Recovery, and Enforcement Act of 1989 (FIRREA) and the subsequent effect of the new regulatory scheme on plaintiffs. It presently is before the court on plaintiffs' motion for summary judgment as to liability and defendant's motion to dismiss or in the alternative cross-motion for summary judgment. Although plaintiffs' complaint advances several legal theories, the prerequisite for recovery under any proposed rationale requires the court to find that plaintiffs had a property right stemming from contract or some other source to include supervisory goodwill as a capital asset for regulatory purposes and to amortize it over 35 years.

After careful consideration of the arguments advanced in the parties' briefs and during extensive oral arguments, the court denies the parties' motions, with leave to renew or move for judgment on the pleadings under RUSCC 12(c), if and when appropriate. The court is of the opinion that summary judgment on liability is precluded because a genuine issue of material fact remains, and requests further briefing in order to resolve this issue.

The court further finds that although there were express agreements among the parties, the transaction as a whole is represented by an implied-in-fact contract. For reasons set forth below, the court reserves its consideration of the taking claim.

## FACTS

The facts presented here are intended to provide the reader with a basic understanding of the context in which this dispute arises, and are not intended as a complete factual statement of the case.

Plaintiffs are Winstar Corporation and United Federal Savings Bank, a federal stock savings bank, all of the common stock of which is owned by Winstar. Winstar was formed in 1984 for the sole purpose of acquiring Windom Federal Savings & Loan Association. Windom had shown substantial operating losses in its 1983 year-end report. Faced with the probable need to liquidate Windom, at an alleged cost to the government of over $12 million, the Federal Home Loan Bank Board (FHLBB) actively solicited bids for its acquisition from a list of potential acquirers, among which were the organizers of Winstar. In late 1983, FHLBB and the Federal Savings and Loan Insurance Corporation (FSLIC) began negotiating with the organizers of Windom. FSLIC eventually recommended to FHLBB that it approve Winstar's merger proposal, based on its analysis of several factors, including the cost to the government of the available alternatives. Winstar's proposal was estimated to be the least costly to the government of all the acquisition proposals, and less than half as expensive as the liquidation of Windom.

Included in Winstar's proposal was the provision that the acquisition employ the purchase method of accounting. Under this method, as described by plaintiffs and not disputed by defendant, the book value of the acquired thrift's assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was separately recorded on the acquirer's books as "goodwill." In other words, the government agreed to allow the plaintiffs and others in similar circumstances to treat what was a deficit in capital as an asset. Goodwill was considered an intangible asset that could be amortized on a straight-line basis over a number of years. The difference between the aggregate fair market value of liabilities assumed by the acquirer and the aggregate fair market value of the failing thrift's assets was known as "supervisory goodwill," in the context of a supervisory merger, and was recorded on the resulting institution's balance sheet as an asset includable in capital for purposes of satisfying FHLBB's minimum capital requirements.

Winstar's initial proposal subsequently was modified, but at all times indicated that the purchase method of accounting would be used. The proposal ultimately accepted by the government called for a 35-year period for the amortization of this asset. It was anticipated that after such time, at the very latest, the institution real-

ly would be in the black. It was hoped that by doing this, with some real infusions of new money and a certain number of years to eliminate this unusual asset, the savings bank could work its way out of the deficit.

In 1989, President Bush signed into law the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183 (Aug. 9, 1989) (now codified at various sections of Title 12 of the United States Code). Among the many changes effected by the act are extensive amendments to the Home Owner's Loan Act, codified at 12 U.S.C. §§ 1461–1468, significantly affecting the regulation of the savings and loan industry. The most important provisions for purposes of this case relate to the permissible regulatory treatment of supervisory goodwill.

Under the new law, a certain amount of supervisory goodwill is permitted to be amortized for no more than 20 years. The law restricts on a declining basis the percentage of that goodwill that may be included as capital. The statutory mechanism for this is found in the transition rule that applies to capital standards, at 12 U.S.C. § 1464(t)(3)(A). That section reads as follows:

> Notwithstanding paragraph (9)(A) [defining core capital generally to exclude intangible assets], an eligible savings association may include qualifying supervisory goodwill in calculating core capital. The amount of qualifying supervisory goodwill that may be included may not exceed the applicable percentage of total assets set forth in the following table. . . .

The table indicates that from the date of enactment through December 31, 1994, the percentages decline from 1.500% to 0.375%, after which time no amount will be includable.

"Qualifying supervisory goodwill" is a defined term, the definition of which is found at 12 U.S.C. § 1464(t)(9)(B).

> The term "qualifying supervisory goodwill" means supervisory goodwill existing on April 12, 1989, amortized on a straight-line basis over the shorter of—

> (i) 20 years, or

> (ii) the remaining period for amortization in effect on April 12, 1989.

Plaintiffs allege that the exclusion under FIRREA of at least some of plaintiffs' supervisory goodwill is in violation of the parties' agreement, and constitutes a breach of contract and, in the alternative, a taking of plaintiffs' contract rights. It also is alleged that as a result of this section, plaintiffs have suffered severe losses.

## DISCUSSION

■ The immediate issue before the court is a garden variety question of whether a contract, express or implied, existed. Although there certainly were express representations made, they combined to create a transaction, which, as a whole, is represented by a contract implied-in-fact.

There is a significant amount of precedent involving the elements required to show an implied-in-fact contract in this court. It has been stated that:

> A contract implied in fact requires a showing of the same intent to contract as that required for an express contract. . . . It is essential . . . that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.

*Russell Corp. v. United States,* 537 F.2d 474, 210 Ct.Cl. 596, 609 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977) (footnotes omitted). *See also Somali Dev. Bank v. United States,* 508 F.2d 817, 205 Ct.Cl. 741, 751 (1974) ("Before a contract may be implied in fact, there must be a meeting of the minds which is inferred from the conduct of the parties, and in the light of the surrounding circumstances, shows their tacit understanding."). Of course, mutual assent is not sufficient to imply a contract. "[T]here must be some consideration moving to the United States, or the Government must have received

money under a duty to pay it over, or the claimant must have had a lawful right to the money when it was received, such as money paid under a mistake." *Id.* 508 F.2d 817, 205 Ct.Cl. at 751 (citing *Knote v. United States,* 95 U.S. 149, 156, 24 L.Ed. 442 (1877)).

Defendant vigorously claims that neither FSLIC nor FHLBB agreed that there would be no changes in regulatory policy with respect to goodwill, nor could they so bind Congress. Plaintiffs assert, with equal vigor, that the government expressed an unequivocal agreement that plaintiffs would be permitted to continue to treat supervisory goodwill as a capital asset and to amortize it for 35 years, regardless of changes in generally accepted accounting principles (GAAP) or in regulatory policy.

The undisputed evidence confirms plaintiffs' position. Among the relevant documents evidencing the parties' intent is the correspondence from the FHLBB to the Board of Directors of United dated July 13, 1984, and referred to in this litigation as the forbearance letter. The first paragraph of the letter indicates that its purpose is "to confirm the understanding that:," and continues to enumerate several terms of the acquisition. Paragraph 2 reads as follows:

> For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by Savings Bank over a period not to exceed 35 years by the straight-line method;....

The letter also indicated that the FHLBB recognized that the accounting practices mentioned may have deviated from GAAP: "The accounting forbearances ... are not acceptable in any financial statements which are required to be prepared in accordance with generally accepted accounting principles."

Further evidence of defendant's intent is found in two inter-office memoranda from financial analysts at FHLBB, both of whom were reporting on viability analyses regarding the proposed acquisition. The first

memo, dated March 14, 1984, listed among its "Relevant Assumptions" the following:
> 2. Purchase accounting is applied to the assets of Windom.... Goodwill is amortized over 40 years.

The second memo, dated May 30, 1984, similarly listed among its "Relevant Assumptions" that "[g]oodwill is amortized over 35 years." Based on these assumptions, the FHLBB estimated the amount of financial assistance to be provided by FSLIC and the acquirers, respectively. An additional inter-office memorandum from the Deputy Director of Program/Administration of the FHLBB to the Assistant Director of the agency, dated June 1, 1984, indicated the appropriateness of the purchase method of accounting for the proposed transaction, as well as the office's "lack of objection to the accounting forbearance outlined for purposes of reports to the FHLBB."

The documents discussed above are representative of the evidence that leads this court to the firm conclusion that the government expressly intended to contract for the particular treatment of goodwill at issue in this case, notwithstanding changes in GAAP or in the statutory scheme. There is no support for the defendant's argument that these statements merely were representations of the then-existing regulatory policy. Rather, they illustrate the reality that the promise of continued treatment of goodwill as a capital asset that could be amortized over 35 years was a negotiated and critical term of this particular transaction. It was critical because it was clear that without it no purchaser would have engaged in this transaction.

Defendant attempts to mischaracterize plaintiffs' claim as one which improperly seeks to bind the government's power to regulate. To support its motion to dismiss on this ground, defendant cites *Bowen v. Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986) (*POSSE*) ("contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign" (quoting *Merrion v. Ji-*

*carilla Apache Tribe*, 455 U.S. 130, 147, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982))); *St. Louis v. United Railways Co.*, 210 U.S. 266, 273–75, 280, 28 S.Ct. 630, 634, 52 L.Ed. 1054 (1908) (sovereign power to tax retained unless "specifically surrendered in terms which admit of no other reasonable interpretation"); *Vicksburg, Shreveport & Pacific Rail Road Co. v. Dennis*, 116 U.S. 665, 668, 6 S.Ct. 625, 626–27, 29 L.Ed. 770 (1886) (" 'neither the right of taxation, nor any other power of sovereignty, will be held by this court to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken' "); and *Peterson v. United States Department of Interior*, 899 F.2d 799 (9th Cir.1990) (rejecting claim by water management districts that they had contractual right to continue delivering subsidized water to leaseholds of any size notwithstanding change in statute limiting size of leaseholds to which the water could be delivered). All of these cases, however, recognize that there are contracts to which the government *must* be bound, particularly when the government has received a bene- fit. *E.g., POSSE*, 477 U.S. at 52, 106 S.Ct. at 2396–97 (citing *Perry v. United States*, 294 U.S. 330, 350–54, 55 S.Ct. 432, 434–37, 79 L.Ed. 912 (1935)); *Lynch v. United States*, 292 U.S. 571, 586, 54 S.Ct. 840, 846–47, 78 L.Ed. 1434 (1934).

It is critical to this case, and apparently misconstrued by defendant, that plaintiffs are not claiming that the government contractually bound Congress not to change its regulations. Rather, plaintiffs claim that in their particular transaction with the government, it was agreed that they would be permitted to treat supervisory goodwill in a particular way for a fixed number of years. Thus, while Congress' power to regulate is not impaired, the government may be compelled to pay for the results of its actions, especially when in so doing the government actually is paying because it received a benefit. An analogy may be drawn to the corporate world, in which under state law and a corporation's by-laws its board of directors' ability to act for the good of the shareholders may not be limited. Notwithstanding this prohibition, the corporation may be required to pay for its actions, such as firing an officer, although the legitimacy of its action is not questioned. With respect to government actions, an analogous situation may be found in the area of regulatory takings. Although Congress may exercise its police power and regulate extensively, in some cases when it does so it must provide just compensation if the result of the regulation effectively is to condemn a property right. *See, e.g., First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 145, 98 S.Ct. 2646, 2669–70, 57 L.Ed.2d 631 (1978) (Rehnquist, C.J., dissenting). The fact that the government was free to change its regulatory scheme is not inconsistent with the possibility that there exists a contract here under which the government may have obligations to the plaintiffs in this case.

Finally, defendant argues that in determining whether there exists a contract the court is required to interpret the transaction in light of the policies underlying the controlling legislation. *See Peterson*, 899 F.2d at 807 (relying on *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 87–88, 79 S.Ct. 141, 144, 3 L.Ed.2d 132 (1958)). Accepting this proposition, the court is convinced that at least part of the policy reflected in the prior and current regulatory schemes is a strong desire, if not need, on the part of the government to involve the private sector in rescuing failing savings and loans. This view, coupled with the fact that no other private entity would have entered into an agreement to purchase Windom without an agreement to allow it to continue to treat supervisory goodwill as a capital asset and to amortize it over 35 years (or a comparable alternative to achieve the same result), buttresses plaintiffs' assertions.

In the instant case, there is ample evidence to support the court's finding that a contract implied-in-fact was formed be-

tween the organizers of Winstar and the United States. This contract embraced the entire transaction by which Windom was acquired by Winstar and merged into United. This contract includes the various written agreements among all interested parties. Among the critical terms of this contract were the obligations on the part of the government to put approximately $1.95 million directly into United and to contribute an additional several million dollars based on Windom's aggregate negative net worth, a sum that ultimately amounted to $3,694,499, for a total cash contribution of $5,644,499. Winstar, in turn, was obligated to immediately put $2 million into United. As an additional and critical term of the contract, the government agreed to permit Winstar to treat supervisory goodwill as a capital asset to be amortized over 35 years. It must be stressed that the contract provided that this particular institution would be permitted to continue the treatment of supervisory goodwill as a capital asset that could be amortized over 35 years, and not that the regulations would not change. In consideration, the government received the benefit of relief from its obligations to liquidate Windom or otherwise provide for the depositors of Windom, the value of which, while certainly substantial, remains to be determined.

■ The court also finds, contrary to defendant's contention, that this contract is not governed by the Contract Disputes Act because it is not a contract for "the procurement of property, ...; services; ... construction, alterations, repair or maintenance of real property; or, ... the disposal of personal property." 41 U.S.C. § 602(a) (1988).

Because it is preferable to resolve disputes in such a way as to avoid constitutional considerations, *see, e.g., New York City Transit Authority v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1978); *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944), and because the resolution of plaintiffs' contract claim may obviate the need to proceed on the taking claim, further consideration of plaintiffs' taking claim is suspended.

### CONCLUSION

■ Defendant's argument that the government could not have been a party to the acquisition because the government never owned Windom belies the actual nature of the relationships among the parties, and the character of the transaction. Far from solely providing the necessary regulatory approval for the acquisition, the government was a necessary party to the occurrence of this transaction. It was a party to the implied-in-fact contract, obligating itself and accepting consideration from plaintiffs.

■ The court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability, and requests further briefing on: whether a breach occurred; if so, whether it resulted in injury; if so, the type and measure of relief appropriate. A status conference to establish a briefing schedule will be scheduled by subsequent order.