## FIRST COMMERCE CORPORATION, Plaintiff,

v.

## The UNITED STATES, Defendant.

### No. 92–731 C.

United States Court of Federal Claims.

July 26, 2002.

---

Rosemary Stewart, Washington, DC, for plaintiff First Commerce Corporation.

John J. Hoffman, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for

---

defendant. Maureen A. Delaney, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

This case is before the court on plaintiff's [1] motion for summary judgment on liability for breach of contract and defendant's motion to dismiss and cross-motion for summary judgment on liability. Plaintiff First Commerce Corporation (First Commerce) claims that defendant's passage of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) breached defendant's agreement with First Commerce by requiring First Commerce 1) to deduct immediately all of the goodwill and other intangible assets arising from its acquisition of a financially troubled thrift and 2) to deduct immediately a portion of the goodwill and other intangible assets from its core capital and risk-based capital computation and to deduct the balance on an accelerated amortization schedule. This opinion addresses the cross-motions for summary judgment.[2] For the following reasons, plaintiff's motion for summary judgment on liability is DENIED and defendant's cross-motion is GRANTED. Defendant's motion for dismissal is MOOT.

## I. Background

In the early 1980s, savings and loans companies, or thrifts, experienced severe economic problems causing many of them to fail. *United States v. Winstar Corp. (Winstar III)*, 518 U.S. 839, 845, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).[3] The Federal Home Loan Bank Board (FHLBB) and its insurance branch, the Federal Savings and Loan Insurance Corporation (FSLIC), did not have the funds to liquidate all of the failing thrifts. *Id.* at 846–847, 116 S.Ct. 2432. As a result, they adopted a policy of encouraging healthy thrifts to acquire financially troubled thrifts to reduce their liquidation costs. *Id.* at 847, 116 S.Ct. 2432. FHLBB encouraged these acquisitions by providing incentives to healthy thrifts. *Id.* at 848, 116 S.Ct. 2432. These incentives included accounting treatment designed to allow the acquiring institutions to comply with regulatory capital requirements after acquiring failing thrifts. *Id.* The accounting procedures included allowing the acquiring institution to designate the excess of the purchase price over the fair value of all identifiable assets as an intangible asset of goodwill and allowing that goodwill to be amortized over an extended period. *Id.* at 848–51, 116 S.Ct. 2432. The accounting procedures permitted the thrift to appear to hold more assets than it actually possessed. *Id.* at 852–55, 116 S.Ct. 2432.

First Commerce is an Indiana corporation formed in 1987 for the purpose of acquiring a savings bank. Plaintiff First Commerce Corporation's Proposed Findings of Uncontroverted Fact (Pl.'s PFUF) ¶ 3.[4] First Commerce is owned by a holding company, an Indiana limited partnership organized in 1986. *Id.* During its corporate formation, the president of First Commerce spoke with a representative of the Federal Home Loan Bank of Indianapolis (FHLB Indianapolis). *Id.* ¶¶ 3–4. FHLB Indianapolis advised First Commerce that FHLBB and/or FHLB Indianapolis could provide incentives to First Commerce if it acquired a troubled thrift. *Id.* ¶ 4. After reviewing the financially troubled thrifts identified by FHLB Indianapolis as available for acquisition, First Commerce decided to acquire Mutual Federal Savings Bank (Mutual Federal). *Id.* ¶ 5.

---

1. The original complaint was filed by First Commerce Corporation, First Commerce Savings Bank and the Federal Deposit Insurance Corporation. The claims of First Commerce Savings Bank and the Federal Deposit Insurance Corporation were dismissed with prejudice on April 22, 2002. *See* Order dated April 22, 2002.

2. Plaintiff First Commerce Corporation's Proposed Findings of Uncontroverted Fact (Pl.'s PFUF) ¶ 26.

3. For a more detailed history of the savings and loan industry crisis and the government's response, see *Winstar III*, 518 U.S. at 843–58, 116 S.Ct. 2432.

4. Unless noted, a fact cited to only one party's pleadings is not in dispute.

On November 6, 1987, First Commerce and its holding company filed Application H-(e)1 with the FHLBB seeking approval to acquire all of the outstanding stock of Mutual Federal in a proposed supervisory conversion.[5] *Id.* ¶ 7. First Commerce stated that it would inject $1.2 million in cash into Mutual Federal in exchange for Mutual Federal's newly issued stock. *Id.* On January 13, 1988, First Commerce amended its application to include the transfer of a mortgage banking company previously owned and operated by First Commerce to a newly created subsidiary of Mutual Federal. *Id.* First Commerce's application also requested that the value of all "intangible asset[s] resulting from the application of purchase accounting . . . be amortized . . . using the level yield method over the lives of the related assets giving rise to such intangible asset."[6] *Id.* ¶ 8.

In November of 1987, Mutual Federal filed an Application for Voluntary Supervisory Conversion with the FHLBB. *Id.* ¶ 12. Mutual Federal detailed its plans to convert from a mutual savings bank to a federally chartered capital stock savings bank with its newly-issued stock to be sold to First Commerce. *Id.* This plan allowed First Commerce to become the sole shareholder of Mutual Federal and provided Mutual Federal with capital from the stock's purchase price. *Id.* Mutual Federal's application to FHLBB included the same forbearances sought by First Commerce in its application to acquire Mutual Federal. *Id.* ¶ 13.

On May 26, 1988, FHLBB approved both First Commerce and Mutual Federal's applications. *Id.* ¶ 14. The approval letter sent to First Commerce detailed several condi-

tions for First Commerce's acquisition of Mutual Federal.[7] *Id.* ¶ 15. The approval letter also approved a separate forbearance letter granting four forbearances to First Commerce. *Id.* ¶ 16. Two of the forbearances concerned the amortization period for the goodwill that resulted from the purchase accounting for the acquisition. *Id.* On July 1, 1988, First Commerce acquired all of Mutual Federal's stock and changed Mutual Federal's name to "First Commerce Bank, A Federal Savings Bank" (FCC's thrift). *Id.* ¶ 18. This transaction resulted in both intangible assets and goodwill. *Id.* ¶ 19. In First Commerce's annual report for the year ending June 30, 1989, it stated that its capital exceeded the required regulatory minimum. *Id.* ¶ 27.

With the passage of FIRREA in 1989, Congress established new requirements concerning the regulatory capital of thrifts. 12 U.S.C. § 1464(t) (2001). FIRREA also created the Office of Thrift Supervision (OTS), an agency charged with prescribing required capital standards for thrifts. 12 U.S.C. §§ 1462(1),(3) and 1464(t)(1)(A) (2001). These new requirements mandated that FCC's thrift deduct from the computation of its tangible capital the goodwill and other intangible assets arising from First Commerce's acquisition of Mutual Federal. Pl.'s PFUF ¶ 26. FCC's thrift was also required to deduct a portion of the goodwill and other intangible assets from its core capital and risk-based capital, and to amortize the balance over a less favorable period. *Id.*

On June 30, 1990, First Commerce's annual report stated that FCC's thrift had failed to meet its tangible and risk-based capital

---

5. This followed the submission of a bid letter to FHLB Indianapolis acknowledging that First Commerce was planning to file an application to acquire Mutual Federal. Plaintiff First Commerce Corporation's Response to Defendant's 3/26/02 Supplemental Brief on Liability (Pl.'s Resp.) at Tab A.

6. First Commerce also requested forbearances from FHLBB's enforcement of its regulatory capital regulations based on any operating losses or capital losses resulting from Mutual Federal's assets, FHLBB's permission for the thrift to branch into the Indianapolis area, and forbearances concerning First Commerce's company debt. Pl.'s PFUF ¶ 9.

7. FHLBB's conditions for First Commerce's acquisition of Mutual Federal included a requirement that the conversion be completed within 90 days, that First Commerce purchase all of Mutual Federal's stock for at least $1.2 million and that First Commerce execute a regulatory capital maintenance and dividend limitation agreement. Pl.'s PFUF ¶ 15. FHLBB also required that an analysis with a concurring opinion by an independent public accountant be submitted demonstrating that the Mutual Federal acquisition had been completed in accordance with generally accepted accounting principles (GAAP). *Id.*

requirements on December 31, 1989, and that First Commerce had infused additional capital during 1990. *Id.* ¶ 27. On September 30, 1990, FCC's thrift again failed to meet the regulatory capital standards. *Id.* An internal memorandum of OTS noted that FIRREA's new capital requirements jeopardized the ability of FCC's thrift to maintain capital compliance. *Id.* ¶ 28. In 1991, after OTS found that FCC's thrift was unsafe and unsound due to insufficient capital and negative tangible capital and that it was failing each of its capital requirements by a significant margin, *Id.* ¶ 30, FCC's thrift was placed in receivership. *Id.* ¶ 27. On October 20, 1992, First Commerce filed suit. *See* Complaint.

## II. Discussion

### A. Summary Judgment Standard of Review

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those facts that might affect the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The non-movant must establish the existence of a material element on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant's evidence is examined in the light most favorable to the non-movant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all justifiable inferences must be drawn in favor of the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Credibility determinations and the weighing of evidence are inappropriate when ruling on a motion for summary judgment. *Id.* When, as here, there are cross-motions for summary judgment before the court, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 450, 457 (1999).

### B. Determination of Liability in a *Winstar*-related Case

Following the passage of FIRREA, many thrifts that had relied on government-approved accounting procedures became noncompliant. *Winstar III*, 518 U.S. at 857–58, 116 S.Ct. 2432. As a result, over 120 thrifts sued the government. *Advance Bank v. United States*, 52 Fed.Cl. 286, 286–87 (2002). The *Winstar*-related cases involve orders and opinions being issued on an almost weekly basis, thereby creating an evolving body of law. The current jurisprudence stems from a 1996 Supreme Court decision concerning three thrifts, Glendale, Winstar and Statesman, severely affected by FIRREA. *Winstar III*, 518 U.S. at 858, 116 S.Ct. 2432.[8] *Winstar III* held that the government made binding agreements with the thrifts when it granted them certain regulatory forbearances. *Id.* at 858–70, 116 S.Ct. 2432. FIRREA's elimination of these forbearances caused the government to breach its agreements with the thrifts. *Id.* at 857–58, 116 S.Ct. 2432. In *Winstar III*, the government argued that 1) the documents involved in the transaction were statements of regulatory policy rather than contractual undertakings and 2) plaintiffs assumed the risk of regulatory change. *Id.* at 862–65, 116 S.Ct. 2432. However, the Court agreed with the plaintiffs that the government had made contractual promises with the thrifts and that the thrifts had not assumed the risk of regulatory change. *Id.* at 843, 116 S.Ct. 2432.

---

8. The case originated in the United States Claims Court when the Winstar thrift alleged breach of contract causing severe financial losses. *Winstar Corp. v. United States (Winstar I)*, 21 Cl.Ct. 112, 114 (1990). The court found that a contract existed between the thrift and the government. *Id.* at 117. On appeal, the Court of Appeals for the Federal Circuit affirmed the trial court, agreeing that "the thrifts' contracts are enforceable against the government and that the government bargained to allow the thrifts to count certain intangible assets created in their mergers as capital assets for specified periods of time." *Winstar Corp. v. United States*, 64 F.3d 1531, 1551 (Fed.Cir.1995) (*Winstar II*). The Supreme Court heard a consolidated appeal of cases involving Winstar Corporation, Glendale Federal Bank, FSB, and The Statesman Group, Inc. *Winstar III*, 518 U.S. at 858, 116 S.Ct. 2432.

In *Winstar III*, each thrift's contract with the government involved slightly different documents, but each contained an assistance agreement with an integration clause. *Id.* at 862–63, 867, 116 S.Ct. 2432. First, as to the Glendale thrift, the Court found that the Supervisory Action Agreement characterized itself as a contract, and that the amount of money involved and the regulator's demonstrated propensity to change the regulations supported a finding of a contractual commitment. *Id.* at 863, 116 S.Ct. 2432. Second, as to the Winstar thrift, the Court found a contract based on overall documentation of the transaction, including an express agreement with an integration clause. *Id.* at 864–66, 116 S.Ct. 2432. The Court's conclusion was supported both by the amount of money involved and by the fact that, without the agreement, the Winstar thrift would have been out of compliance with regulatory capital requirements from the date of its establishment.[9] *Id.* Third, as to the Statesman thrift, the Court found a contract with the government through an Assistance Agreement with an integration clause, the thrift's lack of initial compliance with regulatory capital requirements without the agreement, and the fact that the agreement contained an express commitment permitting use of capital credits to calculate regulatory capital. *Id.* at 866–67, 116 S.Ct. 2432.

In determining that the government breached contracts with the three thrifts, the Court applied "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties" to the relevant documents and circumstances. *Winstar III*, 518 U.S. at 870–71, 116 S.Ct. 2432. However, as the thrifts at issue in *Winstar III* all involved assistance agreements with integration clauses, the Court's decision did not define what other documents can also establish a contract when there is no assistance agreement. Lower court decisions have addressed this question, but each decision is necessarily

fact-specific. *See Cal. Fed. Bank v. United States (Cal. Fed. I)*, 39 Fed.Cl. 753, 775–76 (1997), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001) (*Cal. Fed. II*), *cert. denied,* 122 S.Ct. 920 (2002).

In 1997, the Court of Federal Claims addressed eleven common issues appearing in four *Winstar*-related cases. *Id.* at 755–56. In three of the cases examined by the court, the thrifts' arrangements did not contain written assistance agreements, but the court nonetheless found contracts present. *Id.* at 774–76. Following *Winstar III*, the court in *Cal. Fed. I* found that the relevant issue was whether "the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda, and Bank Board resolutions confirm that intent." *Id.* at 773. The court found that the factual records demonstrated intent by the thrifts and the government to contract, despite the absence of assistance agreements. *Id.* at 776.

On appeal, the Court of Appeals for the Federal Circuit upheld the finding of a contract between the government and California Federal, one of the thrifts examined in *Cal. Fed. I. Cal. Fed. II*, 245 F.3d at 1348. The court noted that in each of the transactions lacking assistance agreements, the acquiring thrift specifically requested approval for its goodwill amortization schedule and the FHLBB granted that specific request. *Id.* at 1345 ("Cal Fed specifically requested approval from the [FHLBB] to amortize goodwill created by the acquisition over the estimated useful life of 35 years. The FLHBB ... issued a forbearance letter stipulating that the resulting association may amortize any goodwill created over 35 years."). The Federal Circuit, citing to its prior holding in *Winstar Corp. v. United States,* 64 F.3d 1531, 1542 (Fed.Cir.1995) (*Winstar II*), also noted that extensive negotiations provided further evidence of intent by both parties to

---

**9.** In the trial court's *Winstar I* opinion, the court found that "[a]lthough there certainly were express representations made, they combined to create a transaction which, as a whole, is represented by a contract implied-in-fact." *Winstar I,* 21 Cl.Ct. at 114. Evidence used to support this

finding included correspondence between the FHLBB and the failing thrift detailing the type of accounting procedures to be used after the acquisition and the FHLBB's inter-office memoranda reporting on the length of the amortization period. *Id.* at 115.

use supervisory goodwill for regulatory capital purposes. *Id.* at 1347.

Subsequent *Winstar*-related decisions have found that not all documents are by themselves sufficient to establish a contract. In *Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 264, 278, *amended by* 52 Fed.Cl. 637 (2002), the court denied plaintiff's summary judgment motion because a disputed material fact remained as to whether or not the government intended to enter into a contract with the plaintiff bank. Although noting that government intent to contract can be found without an assistance agreement, the court found that the plaintiff failed to carry its summary judgment burden because Fifth Third's documents did not demonstrate an undisputed intent to contract. *Id.* at 275–77. Unlike the plaintiff bank in *Cal. Fed. II*, the bank in *Fifth Third* had made no independent request for accounting forbearances but instead embedded its request in its application. *Id.* at 275. Nor did the surrounding economic circumstances corroborate an intent to contract because the economic circumstances did not mandate only one interpretation of the parties' intent. *Id.* at 276.

Another recent Court of Federal Claims decision, *Anchor Sav. Bank v. United States*, 52 Fed.Cl. 406, 420 (2002), examined the factual evidence and concluded that the record presented did not permit the court to resolve on summary judgment whether there was a contract. The *Anchor* plaintiff argued that its merger agreement with the thrift, the FHLBB approval letter, and the FHLBB's role in introducing the plaintiff and the thrift demonstrated a contractual promise by the government. *Id.* at 418. The *Anchor* court distinguished these facts from those found in *Cal. Fed. II*, noting that the *Cal. Fed. II* case involved bargained-for transactions and forbearance letters expressing the regulators' assurances. *Id.* at 420. The *Anchor* transaction lacked both documentation of negotiations and forbearance letters. *Id.*

In light of the teaching that each *Winstar*-related case turns on its own facts, the court now examines the material facts presented by First Commerce to ascertain whether there is undisputed support either for plaintiff's view that there is a contract for regulatory accounting forbearances or for defendant's view that there is no such contract. *See* RCFC 56(c); *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505.

C. Whether This Transaction Was Regulatory Or Contractual

■ The necessary elements of a contract with the government include offer, acceptance, consideration, mutuality of intent to contract and authority on the part of the government official entering into the contract. *Cal. Fed. II*, 245 F.3d at 1346.[10] However, deciding whether an agreement actually exists between two parties is a mixed question of law and fact. *Id.* Regulatory documents can be construed as contractual commitments where the reality of a transaction favors such a construction. *Fifth Third*, 52 Fed.Cl. at 274; *see Cal. Fed. II*, 245 F.3d at 1347. The burden of proving that the reality of a transaction favors construing such documents as contractual undertakings, as opposed to regulatory activities, remains with the plaintiff. *Fifth Third*, 52 Fed.Cl. at 275.

Plaintiff contends that a contract was established through its holding company application to FHLBB, FHLBB's approval letter, FHLBB's forbearance letter, and related correspondence, although First Commerce and defendant never executed a written assistance agreement. Pl.'s PFUF ¶ 23. The defendant offers many defenses, including in particular that the documents generated between First Commerce and FHLBB during the acquisition of Mutual Federal are evidence of the government's regulatory authority and do not demonstrate offer, acceptance or intent to contract. Defendant's Response to Plaintiff First Commerce Corporation's Motion for Partial Summary Judgment on Liability and in Support of Defendant's Mo-

---

10. *Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 637 (2002), addressed many of the authority issues raised by defendant. However, in light of the treatment of offer, acceptance and mutuality of intent, the court does not reach the authority issue in this case.

tion to Dismiss and Cross–Motion for Summary Judgment on Liability (Def.'s MTD and MSJ) at 2–3.

### 1. Whether There Was An Offer

■ First Commerce argues that its "written application to acquire Mutual Federal constituted an *offer*, which contained the key terms about purchase accounting and regulatory accounting treatment for the resulting intangibles." Plaintiff First Commerce Corporation's Motion for Summary Judgment on Liability for Breach of Contract (Pl.'s MSJ) at 22. First Commerce contends that its offer included requests for 1) the use of goodwill and other intangible assets arising from using purchase method accounting in its regulatory capital and 2) that the goodwill would be amortized over a 25–year time period. *Id.* at 4.

Plaintiff states that its application was conditioned on receiving goodwill and accounting forbearances. *Id.* at 7–8. Plaintiff points to the "Details of Proposed Acquisition" section of the application for the expression of First Commerce's desire for goodwill. That section stated:

> The $1.2 million amount [of funds to be infused] was determined based on the judgment of First Commerce, the Holding Company and the Institution as the amount of funds necessary to raise the Institution's capital to acceptable levels for regulatory capital adequacy purposes without having to obtain capital assistance from the FSLIC, and to enable the Institution to return to profitable operations on a sound and conservative basis, *taking into account the substantial goodwill that will result from the acquisition.*

*Id.* at 8 (emphasis added). This statement is not a request for a promise to keep the purchase accounting treatment of the goodwill in place. This general reference to goodwill within the application is analogous to the documents examined by the court in *Fifth Third,* where the court distinguished *Cal. Fed. I* by noting that the goodwill was not crucial enough for the plaintiff to do any more than submit the required application form. 52 Fed.Cl. at 275.

Not only did First Commerce never specifically request assurances that the thrift would receive purchase money accounting treatment of goodwill, First Commerce's request for a lengthened amortization period is ambiguous.[11] In fact, First Commerce's only request for a lengthened amortization period is found not in its application but in the bid letter acknowledging that First Commerce would file an application to acquire Mutual Federal. Plaintiff First Commerce Corporation's Response to Defendant's 3/26/02 Supplemental Brief on Liability (Pl.'s Resp.) at 3 n. 3. In the bid letter, signed by the holding company's general partner, the holding company requested that intangible assets be amortized over a 25–year period:

> The FSLIC shall agree that, notwithstanding generally accepted accounting principles, for regulatory accounting purposes, the value of any intangible assets resulting from accounting for the merger of First Commerce into Mutual in accordance with the purchase method may be amortized by the Resulting Institution over a period of 25 years using the straight line method.

*Id.* at Ex. A, p. 5.

However, in the actual application submitted to the FHLBB, First Commerce did not request amortization treatment over a 25–year period using the straight line method. Instead, First Commerce's application, which contained only one forbearance request relevant to the amortization of intangibles,

---

**11.** At this time, GAAP permitted regulators to allow acquiring institutions to amortize goodwill assets over a period not to exceed 40 years. *Analysis and Explanation of FASB Statement–72: Accounting for Certain Acquisitions of Banking or Thrift Institutions,* [Feb.1983] 3 Miller Comprehensive GAAP Guide Update (Harcourt Brace Jovanovich) (3 Miller GAAP Guide) 1. Although GAAP permitted a 40–year amortization schedule, the specific accounting treatment required "express arrangements between the regulators and the acquiring institutions." *Winstar III,* 518 U.S. at 853, 116 S.Ct. 2432. In this case, the court refers to the 25–year period requested in the bid letter as "lengthened" because, at the time that both the bid letter and the application were written, purchase money accounting under GAAP required an agreement to obtain a delayed amortization schedule, although the 25–year period is within the schedule allowed by GAAP. *See id.; see also* 3 Miller GAAP Guide 1.

sought amortization "using the level yield method over the lives of the related assets":

> *Purchase Accounting: Amortization of Intangibles.* For purposes of reporting to the FHLBB, with respect to the books and records of the Institution, the FHLBB shall agree that purchase accounting shall be used to record the purchase of the Institution's capital stock, and the FHLBB shall agree that the value of any intangible asset resulting from the application of purchase accounting *may be amortized by the Institution using the level yield method over the lives of the related assets giving rise to such intangible asset.*[12]

Pl.'s PFUF ¶ 8 (emphasis added). This forbearance request does not request a lengthened amortization period *or the use of the straight line method.* Instead, it refers to "the level yield method over the lives of the related assets."[13] Plaintiff argues that the bid letter and application should be read together. Pl.'s Resp. at 3–4 ("All of the documents here (the bid letter, the application, the FHLBB's *approval and forbearance* letters and the accountant's confirmation letter), read together, show that there was a meeting of the minds regarding both the regulatory treatment of the goodwill and the amortization period."). However, plaintiff's argument on this point does not resolve which amortization treatment First Commerce requested or which, if any, amortization treatment its offer could be viewed as being conditioned on. *See id.* at 3. Unlike the application in *Cal. Fed. II,* First Commerce's application contained no specific request to receive a lengthened period for amortizing the goodwill, much less conditioned its application on receiving such amortization treatment. *Cf.* 245 F.3d at 1345 (finding that "Cal Fed specifically requested approval from the Federal Home Loan Bank Board (FHLBB) to amortize goodwill created by this acquisition over the estimated useful life of 35 years."). The court will address this discrepancy in more detail in the analysis of whether there was acceptance or mutuality of intent.

### 2. Whether There Was Acceptance Or Mutuality Of Intent

Plaintiff contends that FHLBB's approval letter and forbearance letter constitute acceptance of their offer. Pl.'s Resp. at 3. The approval letter set forth several conditions concerning First Commerce's acquisition of Mutual Federal: that the conversion be completed within 90 days; that First Commerce purchase all of Mutual Federal's stock for at least $1.2 million; that a regulatory capital maintenance and dividend limitation agreement be executed by First Commerce; and that First Commerce submit to FHLBB an analysis and a concurring opinion by an independent public accountant indicating that the acquisition by First Commerce had been consummated *in accordance with generally accepted accounting principles (GAAP).*[14] Pl.'s PFUF ¶ 15. The FHLBB's approval letter also approved a forbearance letter sent separately to the president of First Commerce. *Id.* ¶ 16.

---

12. The application submitted to FHLB Indianapolis was subsequently amended on January 13, 1988, to include the transfer of a mortgage company from First Commerce to Mutual Federal to create additional capital. *See* Pl.'s MSJ at Ex. B. Although the relevance of the amendment *is not* argued by the parties, the court observes that First Commerce apparently was not sufficiently focused on the amortization issue to notice discrepancies between its bid letter and application concerning the goodwill and amortization periods when it prepared its amendment.

13. The differences between "the level yield method over the lives of the related assets" and the 25-year straight line method are not inconsequential. GAAP promulgated an amortization period not to exceed 40 years using the straight line method. 3 Miller GAAP Guide 1. However, the Financial Accounting Standards Board (FASB) concluded that "goodwill arising in the acquisition of a troubled banking institution should be amortized over a relatively short period because of the uncertainty about the nature and extent of the estimated future benefits related to the goodwill." *Id.* 2. FASB 72 stated that unidentified intangible assets "shall be amortized to expense over a period no greater than the estimated remaining life of the long-term interest-bearing assets acquired." *Id.* 3, ¶ 5. Thus, amortizing assets over the level yield method is a considerably more rapid schedule than straight-line amortization, and less favorable to the acquiring institution.

14. First Commerce complied with all conditions required by FHLBB. Pl.'s PFUF ¶ 15.

The forbearance letter enumerated four forbearances, the third and fourth of which are relevant to the amortization issue:

3. For purposes of reporting to the [FHLB] Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the purchase, may be amortized by Mutual over a period *not to exceed 25 years by the straight line method.*

4. Not later than 120 days following the date of consummation of the acquisition ("Effective Date"), Mutual shall submit to the Supervisory Agent an opinion of independent certified public accountants that Mutual has accounted for the transaction in accordance with generally accepted accounting principles ("GAAP") except that as herein provided by the Board, for purposes of reporting to the Federal Home Loan Bank Board: (a) the value of *any resulting unidentifiable intangible asset may be amortized by Mutual over a period of 25 years by the straight line method.*

*Id.* (emphasis added). Although the emphasized language in the third and fourth forbearances tracks portions of the language in First Commerce's bid letter, that circumstance does not change the lack of agreement between the forbearances granted in this letter and the forbearances sought by First Commerce in its application.

The terms of the third and fourth forbearances on which plaintiff relies for the terms of the government's acceptance simply do not match the language of First Commerce's application to the FHLBB on which plaintiff relies for the terms of its "offer." *See* Pl.'s PFUF ¶ 8 ("the FHLBB shall agree that the value of any intangible asset resulting from the application of purchase accounting may be amortized by the Institution using the level yield method over the lives of the related assets giving rise to such intangible asset").

In tacit acknowledgment of this disconnect, plaintiff argues that it "is unimportant" that the government's approval and forbearance letters granted a particular amortization period different from that set out in First Commerce's application because "the amortization period granted here is not the heart of [First

Commerce's] contract." Pl.'s Resp. at 3. Plaintiff states that the heart of its contract with defendant is that "the FHLBB promised that the goodwill resulting from the application of purchase accounting would 'count' as regulatory capital." *Id.* However, the approval granted by the FHLBB directly concerned the schedule for amortization of the intangibles, and FIRREA resulted in changes to the amortization schedule. Pl.'s PFUF ¶¶ 16, 26. Following FIRREA, OTS required First Commerce to alter its amortization of the goodwill:

(a) FCC's thrift was required, in computing its "tangible capital," to deduct immediately all of the goodwill and other intangible assets arising from its acquisition of Mutual Federal in 1988; and

(b) FCC's thrift was required, in computing its "core capital" and its "risk-based capital," to deduct immediately a portion of the goodwill and other intangible assets arising from the acquisition, and to deduct the balance on a much more rapid (and thus less favorable) amortization schedule than that originally agreed upon.

*Id.* ¶ 26.

It is instructive to juxtapose the conflicting documentation in this case with the documents examined in *Cal. Fed. II.* In that case, the court found that the thrift requested thirty-five and forty-year amortization periods for intangible assets for the two transactions as issue, and the FHLBB, after negotiation, granted thirty-five and forty-year amortization periods for those two transactions. *Cal. Fed. II*, 245 F.3d at 1345, 1347. In contrast, this transaction does not involve any evidence of specific terms negotiated, agreed on, and relied upon by the parties. Def.'s MTD and MSJ at 8–11.

3. Whether The Surrounding Circumstances Support The Existence Of A Contract

Defendant asserts that the regulatory approvals and forbearances associated with First Commerce's acquisition of Mutual Federal demonstrate only the routine exercise of the FHLBB's regulatory authority to ap-

prove acquisitions. Def.'s MTD and MSJ at 2. Defendant contends that the application submitted by First Commerce relates to its desire to acquire Mutual Federal, and that there is no indication that it sought any contractual promises from the defendant. *Id.* at 22–23. While this argument had little success in other courts examining *Winstar*-related cases, *see Cal. Fed.,* 39 Fed.Cl. at 777 (noting that "Defendant clearly lost this argument [in *Winstar III*]"), the holdings in these cases do not foreclose the possibility that a healthy thrift could have taken a business risk by acquiring a failing thrift without seeking contractual promises from the government. *See Fifth Third,* 52 Fed.Cl. at 277.

While First Commerce's forbearance letter certainly appears advantageous in that it provided First Commerce with more lenient accounting than requested in the application, there are no surrounding circumstances to suggest that First Commerce would not have acquired the thrift without the forbearances, or that it bargained for any contractual promises. An assistance agreement and integration clause are not necessary to demonstrate contractual intent. *Cal. Fed. II,* 245 F.3d at 1346–47. However, without such an agreement, the other documents and surrounding circumstances must by themselves demonstrate an intent to contract for a court to conclude that a contract existed. *Id.* at 1347. Further, First Commerce's application and Business Plan—which are undisputed contemporary documents—indicate that the amortization period was not a central consideration in First Commerce's acquisition of Mutual Federal.

The Court in *Winstar III* noted that the Glendale thrift involved hundreds of millions of dollars, and would have been out of compliance with regulatory capital standards from its inception without the regulatory forbearances. 518 U.S. at 866, 116 S.Ct. 2432. The court in *Cal. Fed. I* concluded that "the absence of immediate insolvency without supervisory goodwill does not mean that the thrift would have entered into the transaction." 39 Fed.Cl. at 768. The Court in *Winstar III* noted, however, that "one can imagine cases in which the potential gain might induce a party to assume a substantial risk that the gain might be wiped out by a change in the law." 518 U.S. at 863, 116 S.Ct. 2432. While economic circumstances should not be a litmus test for determining the existence of a contract, *Winstar III* does not counsel ignoring these circumstances. As context for interpreting this transaction, the economic circumstances favor the arguments of defendant.

Defendant argues that the economic circumstances of neither First Commerce nor Mutual Federal required regulatory forbearances for First Commerce to remain in capital compliance after the acquisition. Def.'s MTD and MSJ at 9–10. Plaintiff acknowledges that this transaction was one of the smallest *Winstar*-related cases because Mutual Federal had only $10 million in assets. Plaintiff First Commerce Corporation's Reply to Defendant's Response to Plaintiff [First Commerce's] Motion for Partial Summary Judgment on Liability and Opposition to Defendant's Cross–Motion for Summary Judgment on Liability (Pl.'s Rep.) at 2. First Commerce's Business Plan, submitted in support of its application to FHLBB, indicated that it anticipated maintaining regulatory capital exceeding the regulatory capital requirements. Pl.'s PFUF ¶ 13; *compare Winstar III,* 518 U.S. at 866, 116 S.Ct. 2432 ("and the new Winstar thrift would have been out of compliance with regulatory capital standards from its very inception, without including goodwill in the relevant calculations"). It is informative that the Business Plan was part of the same application which omitted to seek the 25–year amortization schedule as to which plaintiff now claims it has contractual rights. These economic circumstances do not by themselves prove that a contract did not exist, but neither do they support finding a contract. *Cf. Winstar III,* 518 U.S. at 866, 116 S.Ct. 2432 (noting that the negative net worth of the thrift and its need for goodwill to be in regulatory compliance "powerfully support[ed]" finding contractual intent.).

Furthermore, none of the documented communications between the parties support a finding of contractual intent. While negotiations do not by themselves establish a contract, their presence can provide additional

support. The Court of Appeals for the Federal Circuit examined the negotiations surrounding the acquisition of the Winstar thrift and noted, "If the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use." *Winstar II*, 64 F.3d at 1542; *see also Cal. Fed. II* at 1345 (noting that, as demonstrated by the negotiations, "long term amortization of goodwill was a central consideration in [the thrift's] decisions"). In the regulatory context, negotiations can indicate that the parties are embarking on more than the ordinary course of regulations. *Fifth Third*, 52 Fed.Cl. at 277; *see Winstar II*, 64 F.3d at 1542.

Here, the communications between plaintiff and defendant cannot be characterized as "extensive" and, although the word is used to refer to them, are not even recognizable as "negotiations." According to First Commerce itself, the "negotiations" consisted of only two meetings between the president of First Commerce and officials of FHLB Indianapolis to discuss acquiring a thrift. *See* Aff. of Lloyd R. Howe in Support of Plaintiff First Commerce Corporation's Motion for Summary Judgment (Howe Aff.) ¶¶ 8–9. During the meetings, FHLB Indianapolis advised that forbearances "could be" provided to First Commerce and provided First Commerce with the names of several failing thrifts. Pl.'s PFUF ¶¶ 4–5. This lone documentation of "negotiations" concerning forbearances is vague and inconclusive. *See* Howe Aff. ¶ 14 ("As a result of all the above-described discussions and after negotiating the proposed terms of an acquisition directly with Mutual Federal and with the FHLBank of Indianapolis, ... [we] filed an Application...."). There is no further detail concerning the content of these "negotiations," such as when they occurred, what was communicated during them, or who was present during the negotiations. *See* Def.'s MTD and MSJ at 38. The surrounding circumstances in this case do not support the view that the transaction involved any effort to hammer out contract terms, much less that a contract was in fact formed.

III. Conclusion

The undisputed material facts concerning plaintiff's application and defendant's approval do not support the existence of offer, acceptance and mutuality of intent necessary to contract formation and, indeed, support the absence of these three basic elements of a contract. The surrounding circumstances do not support a finding of intent to contract and, indeed, support a finding of an absence of intent to contract. For the foregoing reasons, plaintiff's motion for summary judgment on liability for breach of contract is DENIED, and defendant's cross-motion for summary judgment on liability for breach of contract is GRANTED. The Clerk of the Court is directed to enter judgment for defendant. No costs.

IT IS SO ORDERED.